here. You hear you hear you. The United States Court of Appeals for the Fifth Circuit is now open. According to law, God save the United States of this honorable court. Good morning. Um, thank you for standing, Mr Cleaning. Uh, we want to welcome you here. We're glad we were able to reschedule at such an early date. We hope your health is improving. Um, uh, and the case we have today is number 20 40279 Miller v. Dricks. I'm sure you're both quite familiar with our ordinary regulations, so I won't bother you about those. But I would remind you that we do not. You are not permitted a video or audio. This, uh, hearing it will be streamed and recorded as usual. And also, we would like you to mute any cell phones or devices that you or anyone with you may have so that we're not interrupted. Um, it's been my practice, uh, on my panels to give each attorney five minutes uninterrupted for presentation at the beginning if you choose to use that. So with that, we'll call number 20 40279. I think I'm calling it again. Miller v. Dricks and Mr Cleaning represents the plaintiff. I am a Randall Callanen for a plaintiff. Brian Miller. May it please the court and I would like five minutes uninterrupted. However, I probably won't take that. In this particular case, an excessive force case, a video which has been is a part of the record captures 90% or more of what is important to the underlying merits of the excessive force case that is a part of this action. I believe that plaintiff's brief and their reply brief, excuse me, appellant's and their reply brief adequately sets out the case law, the recitation of facts. And so, uh, but before I get into that, oh, I want to talk about the, uh, the grant of a summary judgment due to lateness of a response. And I just wanted to, um, point out that I have been practicing for 26 years and this is important to some of the case law. And I have never been sanctioned in any court, uh, federal or state. And I have been the solo practitioner pretty much in about 250 cases, which have gone to, uh, well about 200, uh, 240 or so to completion. So, um, I have not been involved in any, uh, behavior in the past, which would say that, oh, look, Mr. Callan has been involved in previous behavior like this. So it's about time to sanction. Um, there was no prejudice by my being late in this case to respond to the motion for summary judgment. It was very late. Uh, and as pointed out, uh, the only mistake that I made was when I was granted an extension, that extension date did not get on my calendar. And I believe I know what it is. It's because probably it's possible that instead of waiting until I put the date on my calendar, I had deleted or put the email into old mail. I make sure that the only way I put old emails, I mean, new emails into the old email is after I put every date that's applicable, whether it's a scheduling order or anything like that. So that's what I think happened. Because sometimes I, I, I used to say to myself, well, I'm going to put that on the calendar. And then all of a sudden there's a, something comes up and I guess I forgot. So that is what I am, uh, you know, responsible for. And so I have implemented a new strategy to make sure that does not happen, that I get all the dates down, that it shouldn't be down. Uh, in this particular case, there was no prejudice, uh, to the whole case because, uh, it was over four months from the time I actually filed the motion, the response to the motion for summary judgment, that the case was set for trial. And this was not a very complex case. It involves a short issue of excessive force. So I do not believe the court would have taken a very long time to come to a, you know, a decision on it. And so there was no prejudice to any party. Now, of course, my client is the one who suffers the most because his case is not heard in the court. So I do not feel that, uh, based upon the case law, I do not feel that, or not feel, I do not believe the court is granting a summary judgment. So therefore, the plaintiff just wants to have his day in court, wants to go back to the district court and to have the case tried. And once again, since there's a video in this case and the case law on excessive force, you know, there's a lot of case law in the Fifth Circuit and elsewhere, Supreme Court on excessive force, which I have, um, the plaintiff, the appellants have put into the brief. I think that there's no sense in wasting the court's time and going over just, you know, once again, what's in the brief. So the, um, the, uh, appellant, uh, just request that this case be put back on the docket of the district court and move forward to trial. Mr. Kalanin, I guess, uh, may I, is it okay? I'll ask a question. Um, did your plaintiff ever get deposed? Yes. Where's the, the, the deposition transcript? It's not in the record. I take it. No, I don't. I don't believe it's in the record. I believe, yeah, I'm pretty sure the deposition was taken. I took the deposition of all of the involved officers. You did? Well, um, so what materials did you file when you, when you ultimately decided to oppose the summary judgment? Okay. Well, there was, um, affidavits, an affidavit of my client, and I'm turning to that page right now. Hopefully I have it here. It's in the record excerpts. Um, well, I'm going to have to pull that up because, uh, well, if it's in the record excerpts, it's in the record excerpts. I concentrated my preparation on the video, but, um, well, I mean, your honor, it's not in the record excerpts. It's in the record on appeal, but okay. Anything else? Not, not for the moment. I could know, know your honor. No, I mean, nothing else supported your response to the summary judgment. You didn't have to the, um, the, uh, the, uh, evidence of the video, uh, the video for one thing. Yes. As well as all medical records. There were medical records of the, of the broken jaw and the, uh, uh, cut to the head. Uh, so that was in there as well. Um, and then what part of the head was cut on? They said the occipital. Occipital. Yeah. Well, I, I didn't have time to look it up. It's at the top of the head, the back of the head, bottom of the head. It's the bottom because, um, I do have a degree in chemistry, your honor, and the eye nerves go all the way straight back to the back of the head and occipital refers to like site. And so, um, that's where the part of the brain for the site is. So that's why it's called the occipital sort of the base of the head. Yes. Okay. Is there any evidence of, uh, injury from the taser being used? Um, uh, I mean, uh, when you use a taser, it puts electrical discharge from one point to the other, and there's usually burns on both of them because the heats up when the electricity goes in and out of an individual. Um, that could have been in the medical records. I'm not 100% certain. Um, when I couldn't tell from the record, when exactly Sergeant Masick used the taser was that after the first time your client was struck or the second time or the third time after he had been struck three times with the butt of the gun on the back of the head. According to the video, you can see it in the video. Plus, you could if you listen carefully, you can actually hear the flood every time it hits the back of his head. Right. I was just asking when the taser was used after all three hits after the hits. The whole event took less than six seconds, right? Um, it was for the hitting in the back of the head. Yes, Your Honor. I mean, that portion of the hitting in the back of the head. Yes, that is correct, John. And I just was reading in Officer Drix's affidavit this morning. It says a crack pipe was located in the yard after Miller had gotten out of the truck. Is that correct? I am not. I am not certain about about that, Your Honor. Is Miller is Miller incarcerated today? Or is he out somewhere? No, he is not incarcerated. What happened to the any charge? Were any charges brought? I believe they were, Your Honor. I believe they were. And I my best recollection is he did serve a short time for a drug charge. That's correct. But he had a warrant out, and that was the reason for the stop, wasn't it? A warrant? Wasn't there a warrant? Well, he did have a warrant for his arrest. I'm not sure exactly for what, whether it was a traffic ticket, but I believe that, um, uh, it could have been that or just, uh, a traffic violation. I know it wasn't. He wasn't like a suspect in a burglary or suspect in any sort of major crime. The briefs say it was a parole violation warrant, a felony parole violation. Well, he could have. He may have been on parole, and it's possible. I believe that it was. He did not report to his parole officer. I believe that was the violation which gave him what's commonly called a blue one, I guess, for violation of a parole or probation. What's your position about the bystander liability against Officer Santos? Do you think he should have intervened or what? Yeah, well, on the video, I believe it shows that Santos is looking in that direction. And generally, the law says, um, in my interpretation, is that the officer needs to, um, intervene by words or action. Most often times, if an officer were just to say, Hey, don't do that or quit hitting that guy or let's just grab his arms, that's usually enough. He's not required to tackle anybody or to start beating on an officer himself. No, nothing like that. But at least by words or action, he is supposed to attempt to interview. And I believe that although it was quick quick time, I believe that he did have time to intervene. If you would act quickly, not in the first hit, maybe not even the second hit. But by the time the third hit in the back of the head with the thud, remember him. And when you're listening, there's a thud to the back of the head so you can hear it and see it. And then there's dricks, um, you know, going, Oh, you know, or making, um, verbalizations in pain. So therefore, there was the, uh, so he got the information that there was excessive force going on. Okay. And, uh, have you have you retained an expert witness for the plaintiff? Uh, in this case, I believe that since there was a video, I don't think we did because I believe this is one of those cases where you can look at the video and video speaks for itself. You don't always need an excessive force. Most of my cases, I do have an excessive force expert. In this case, I don't believe I got one because I had a video. We have a video. Well, how can I mean the apparently the defense of Officer Drix is that he used something called compliance strikes. And I looked up compliance strikes and, um, you know, it seems like a matter of expert opinion whether under what circumstances compliance strikes are appropriate. Well, Your Honor, in this case, there's plenty of case law in the Fifth Circuit and elsewhere that, um, blows to the back of the head. Um, are extreme are considered, you know, very high level of force. And when you look at the video, my client gets on the ground or Mr Miller gets on the ground. He shows his hands first gets on the ground. He's complying. He never tries to run, and no one ever says they saw any weapons. So he we contend he was compliant. So I don't think it's something that obvious. We need an expert testimony. I don't think I don't think that's required. Yeah. Well, he says he hit the upper torso. I think you could look on the video. I don't. I looked at the video this morning. I couldn't tell for sure. I mean, because it's taken from the rear. Yeah, well, that's where the medical records come in with the cut on the occipital region. And then also you can, uh, on the video, you can hear the thuds and him saying, and you can even see him bouncing up. You know, he's bouncing up a little bit, but he gets scared because of the pain and so forth. Well, of course there was pain. I'm just wondering whether if somebody hits you in the short back, you know, somewhere in the upper neck, uh, it might also cause your head to go down boom on the on the pavement. I'm just so I think that may be a disputed issue of fact. Yes, Your Honor. It very well could be a disputed issue of fact, Your Honor. That's what you're hoping for anyway, right? Yes, correct, Your Honor. Yes. What's your best case? Oh, Your Honor, the best case is probably, uh, an old case. I know that the court always asked for my best case and what I don't, um, gosh, uh, I have several in the briefing on it. Okay. All right. That's fine. You've reserved time for rebuttal. Thank you, Mr Selby. Thank you, Your Honor. And may it please the court Steven Selby for the police in this case and the individual officers, Richard Drix, Bradley Masick and Jose Santos. I am happy to take questions at any time during my argument. Um, one thing, um, that was asked that I'll clear this up to begin with. One thing that was asked in the, uh, the the argument of my colleague across the aisle was what was submitted in support of the of the response to the motion for summary judgment. And and the answer to that are only the medical records. And I will also represent to this court that you can go through every page of the medical records and not find any reference to any complaint of the plaintiff about about his leg. So I believe that my colleague on the other side said that the affidavit or declaration of the plaintiff was submitted. It was not. The response was merely the medical records that after answering that question, I think that this case divides itself into two distinct areas of inquiry. Area one is procedural and breaks into two sub parts, and I will address those because that is how the plaintiff briefed the case. So part one of the procedural question is whether or not Judge Brown's use of the word unopposed in a single sentence somehow transforms his carefully considered, well reasoned opinion into a default or automatic summary judgment. Officers believe that the answer to that question is clearly no. The word of the use opposed does not trump a 9.5 page opinion, wherein the district court set forth the facts is presented a clear recitation of the correct burdens in the case and a  qualified immunity and the reasons why the district judge believe the officer's claims were valid. The plaintiff cites to a single sentence in the opinion. That sentence occurs at the first page of the opinion. That's record 4 16. And the sentence reads, quote, Accordingly, I treat the officer's motions for summary judgment is unopposed. I believe that what that sentence should have said is I treat the officer's evidence is undisputed. Um, after citing to that sentence, the plaintiff then ignores nine pages of the opinion. Frankly, the parties in this case could have avoided 20 pages of briefing if the judge simply had not used the word opposed. Mr Selby, for the sake of efficiency, I'll just mention to my colleagues who may not know this, that Judge Brown was on the Texas Supreme Court before he went on the federal district bench. And before that, he was a partner of Baker box law firm where to my understanding, he would have specialized in federal law. I find it a little short of incredible to for the suggestion to be made that he did not know the appropriate standards for summary judgment, and therefore I for myself, uh, am not willing to credit that he screwed up. Your Honor, I completely agree. And I think all you have to do is go through the 9.5 page opinion and see that it is exactly the opinion that any district judge would write when when considering an officer's motion for summary judgment in an in an excessive force case here, three officers motions for summary judgment. He set forth the burdens. He looked at the facts in footnote one of the opinion. He notes that he has viewed the video and did not find the video to contradict the officer's affidavit testimony and, um, and and then discusses excessive force law, qualified immunity law, uh, discusses the groups versus Brewer case, which, frankly, I believe is on point in this case and is a is a case that, frankly, I should have cited in the the the opinion of Judge Brown went through the exact analysis that any judge would go through in considering officers motions for summary judgment. Uh, Mr Shelby, in your view, the video corroborates every. I mean, the video confirms all the findings of the district court. I don't think it the the the lights of the police cars are are flashing. Um, the sirens air going off, and so it is both hard to see and hard to hear. But what I do think it could corroborate actually corroborates that the plaintiff exited his truck quickly, and it gave the officers the impression that, um, that that he was going to flee on foot, leaving the truck. And, um, which, of course, in connection with that and the facts, the district court said that it was unclear whether Miller lowered himself to the ground or whether officer Drix tackled it. I watched the video, and the video to me seems to show that he was already on the ground when drinks got to him. So if I agree with you that the video was unclear, then perhaps you can agree with me that it's not unreasonable that I could watch it and conclude that he was already on the ground when the officer that your honor, I found this report just said, Well, it was unclear whether he was already on the ground or whether he was. He was. He was, I guess, trying to flee. Your Honor, the district court, I believe, said that because of the deposition excerpts of the plaintiff that we attached in support of the motion for summary judgment, the plaintiff actually testified that before he got to the ground that officer drinks bear tackled him. And I think look, interpreting the video is interpreting the video. And what what we must do in this analysis is say, Could a reasonable police officer have perceived what these police officers perceive? But what what I think occurred in my interpretation is is that I I believe the plaintiff was going to flee, but he thought that he was going to flee basic, who was the first officer in line behind him in the in the pursuit. And what occurred was that dricks was so much closer to the point of the basic was that drink surprised him, had a gun on him and say, Get on the ground. And that's what I don't think the point of voluntarily went to the ground. I think the plaintiff was surprised by the presence of dricks. And then he was commanded to the ground with with with with dricks pointing a gun at him. But you agree that the video doesn't clearly show that he was fleeing. I believe that the video clearly shows he exited the pickup quickly. The call itself to the ground. It was he was on the ground before he was tackled. He I don't disagree with you. And if you'll if you'll read the if you'll read the affidavit of dricks, dricks actually says that the plaintiff went to the ground. But I think he went to the ground, not as a Oh, this is on my plan. Always. My belief is that he went to the ground because dricks ordered him there. Drinks was much closer to him than he believed that the drinks was going to be. And drinks ordered to the grant ordered him to the ground with his gun pointed at him. And then he placed his knee on his back, right? So at that point, was he still a flight risk or any threat? Well, your honor, at that point, keep in mind, he has not been patted down. He was not patted down at the initial stop. In and of course, the way he left the pickup, there was no way to pat him down. So I don't I don't know at that point if he is a flight risk, but he is certainly still a danger because the officers do not know if he has a concealed weapon. And he had his hands under his body, his hands were under his body, and he the plaintiff testified, and this is in the deposition excerpts. Of the plaintiff attached to the officer's motions for summary judgment, he admitted that drinks called for his hands. Now he says that he couldn't get them out, but but but he couldn't get them out because because tricks was on him. But, um, you're you're drinks is not drinks has no way to know that that he is not complying because he can't get them out from from from underneath him. So, um, the plaintiff's deposition testimony in this case, I believe, confirms the the officer's affidavits in terms of of why they did what they did. Officer and I also want to while we're while we're on this point, officer drinks. What he testified to was that and if you watch, it's more of it. These are not big roundhouse blows that he is throwing with the gun. It's more of a chop, and he intended to strike the upper right shoulder of the planet. And in fact, in his affidavit, that's what he did. Now, obviously, at some point in time in one of the subsequent blows in one of the subsequent strikes, he missed. He ended up hitting the jaw of the planet. Don't we acknowledge that? But his intention was to strike the upper right shoulder of the planet with the with the gun once again in a chopping motion, not in a roundhouse punch. Um, Your Honor, subpart two of the procedural issue is whether Judge Brown abuses discretion, either in striking plaintiff's response to the motions for summary judgment or denying the motion to alter or mend the judgment or reconsidered the decision. Once again, we believe the answer is a definitive. No, the plaintiff's original deadline for filing a response was July 19th. The plaintiff requested and received unopposed an extension to August 18th. Plaintiff's response was not actually filed until January 17th, 2020, 152 days after the extended deadline. In addition, procedurally, the plaintiff did not file a motion for leave to file a late response along with response did not request any relief under Rule six B and did not even file an explanation for the late response. After the court granted the summary judgment, the plaintiff did file a motion for new trial slash motion to alter slash motion to reconsider. But the motion cast only a very light touch to the application of the pioneer factors did not, in fact, cite the pioneer case and offered as the only non conclusory reason that excusable neglect existed was because neither opposing counsel nor the court reminded him that the response was due. I think it's interesting that also in that motion, the plaintiff did not complain that Judge Brown had incorrectly granted a default summary judgment. I don't see this as a big issue or I, um, that that the plaintiff has presented sufficient evidence, um, in the declaration that was attached to the motion to meet the pioneer factors. But I would point the court to the Adams versus travelers case that we cited where plaintiff had received a couple of extensions. He filed a motion for summary judgment on the second extension one day late on the court struck the district court struck the response to the motion for summary judgment. And, um, the fifth circuit of a panel of this court held that the judge did not abuse his discretion in doing so. Um, and the two cases that the plaintiff sites and as support for that issue are are are in opposite. Um, in the in the, uh, Coleman case, the Coleman Hamming case, it was an OSHA citation that a company missed the deadline to. And Judge Jones, you may remember you actually wrote this opinion, but they missed the deadline by 18 days, and they, um, they set forth in their motion for leave to file it in their request for relief. They set forth in detail their incoming mail procedure, their their their efforts that they took the, um, and, uh, and then once again, only missed the deadline by 18 days. The starter case that the point of also sites is a situation where the plaintiff actually filed a notice of a P filed a motion for extension to file a notice of appeal within the time period allowed. Well, Mr Selby, I think we all understand all that, and I'd like to turn your attention back to, uh, the what happened again. I'm curious about this idea that the crack pipe was located in the yard after he was, uh, dude. It was your honor and and and crack cocaine was actually found in the truck. Oh, I don't. That's a search incident. That doesn't. That's not as interesting to me because the video seems to suggest that as soon as he got out of the car, he raised his hands and then dropped to the ground. Um, so when did he? When was he able to throw the crack pipe out? That's sort of, uh, hard to figure out your honor. I watched the video 50 times and I can see the left hand comes up and then in 1 10th 2 sets of a second comes back down. I never see the right hand come up. And so I think I think going to the ground clearly, the plaintiff could have had the crack pipe in his right hand, and he's trying to get rid of it. It could have been in a shirt pocket, and it fell out during the struggle. I think it could have come from a variety of places. Um, would you be planning to have an expert witness if the case went to trial? We likely would have your honor and our deadline did not pass. The plaintiff's deadline had passed under the docket control order, and the plaintiff had not designated an expert. Our our our expert designation deadline was going to be December the 7th. I'm sorry, February the 7th. And by the way, which I think is is is a reason for the prejudice in terms of the of the the the late father response. But I do want to what these officers were dealing with was an offender that had a felony patrol warrant, an offender that ignored one officer's orders to stop in several commands to turn your truck off. He fled from that officer and refused to stop despite the lights and sirens for four minutes. And it's a situation in which this person had not been patted down. We didn't know if he had a gun, a pistol, a knife in the in the front of his pants and under a shirt. Is this court noted in pool versus Shreveport? The law enforcement officers need to make extraordinarily quick decisions under tense, evolving and unknowable circumstances. Arrests are inherently dangerous and can escalate precipitously if the arrestee is not overcome immediately. And that's these officers did. And, um, yes, we're aware of that. Now, Sergeant did Sergeant Mason in his and again, sorry, I haven't looked at his affidavit. Does his affidavit say that the plaintiff had resisted stepping out of his car during the very first encounter? Well, it's clear from the video that he does resist stepping out. I mean, that part only lasts a few seconds as well, right? Exactly. Yeah. Yeah. Uh, officer Sergeant Mason asked him to turn the truck off, and that is the command that the getting the getting out of the car is going to be the next command. But we can't even get him to follow the first command. Yeah, well, he keeps talking about going to his father's house, right? He does. Your Honor, that's what the plaintiff's brief says. But all in fact, there's an allegation in the plaintiff's brief that Mr Drix explained, asked Sergeant Mason to follow him. Well, he says, he says, Take it to the house, take it to the house, take it to the house three times. There is no request for Mason to following to the house that, um, your honors that I believe that the judge Brown correctly analyze this under the Graham factors that, um, and that this is a case in which no excessive force existed because of the seriousness of the offense and the decision by the plaintiff to flee earlier, the ignoring of the officer's commands and the officer safety issue from the standpoint of we don't know if this person is armed because of what we've done. Were the officers aware of what kind of warrant was out for him? Yes, your honor. That is in their affidavits that he was what he had a felony parole warrant. And then finally, what does that mean? That the violation underlying the parole violation was a felony. Mhm. Well, what? Um, again, Officer, uh, Drix says it was a parole board warrant. It doesn't say felony. I, your honor, I think Sergeant Mason, who was the one who communicated with dispatch, will know that real quickly because I know my time is well, um, because I know my time is coming up. I believe that under the Graham factors that no, no excessive force was used. However, if you get to this, to the clearly established prong of qualified immunity, my belief is that the Griggs versus Brewer case clearly, um, entitles the officers to qualified immunity in this case. Thank you, sir. Mr Kalan and rebuttal. Uh, yes, your honors. I would like to point out a couple of things that I was, um, in response to, uh, Kelly's counsel. Uh, one of the things is Mr Griggs knows he's on the back of Miller. He knows that. And that puts a lot of weight onto Miller. And furthermore, after he hits him once in the back of the head, that's when he at least once. That's what he says. You know, show me your hands. So now he's been hit in the back of the head, very busy, all this weight on him. Mr. Miller is not a large guy. If you, if you look at the, uh, you know, when they pull them up and everything, he's a small man, it's 50 ish or something like that. He's, he doesn't lift weights or anything. So, uh, directs should know that his weight upon the individual's back with the smashing of the head, uh, you know, is going to cause him some, um, you know, not me, maybe not be able to pull his Griggs should know that he's the one who's on his back. If I'm on someone's back, do I know I'm on their back? Of course I know I'm on their back. And so you got a lot of weight on the back. He knows that. And you listen, listen to the time. Maybe when he says, show your hands, it's already after he's hit them at least once. And this causes a great, uh, you know, dizziness. Um, and this sounds very much like a fact question about what, you know, drinks, you know, drinks new and so forth, uh, regarding the expert witness deadline of the, uh, the appellants or the defendants. I allow extension in all my cases. And I would have done the same. If there was some extension that the other side needed, they would just have to ask me. And I would say, sure, have a month, have two months. So you had already gotten your extension without asking for it. What's that? You had already gotten your extension without asking for it. And that you missed the deadline by five months. Oh, no, no, no. What I'm saying there is there was some talk about how there was prejudice, a possible prejudice to the appellee because their expert witness was some preparation. But what I was saying there is, um, just like, um, uh, Mr Selby had granted me an extension. I, of course, would grant him an extension even if he didn't. I do it all the time. So there was no prejudice regarding any expert witnesses. Now, once again, some jurists or at least one jurist over there in the Southern District, he won't even let you have an expert on these cases most of the time. Uh, and so his feeling is that, hey, it's obvious. Look at the video. And I think that was one of these cases. I don't think you would need, uh, an expert witness. So I believe that all of the issues that, uh, the appellees bring up is things that the jury should look at. They should look at the video, see the testimony of the witnesses and, uh, make a decision. Oh, by the way, in the medical records, I didn't get the chance to look those up during appellees presentation and in the medical records, it says exterior scalp, soft tissue swelling. And then it says there are two fractures, one of the jaw and one of like the mandible and something here. So it's not one fracture, but two fractures. And then there's that, um, he notes swelling the back of the head. So the medical records say he was hit on the head. I don't see it any other way. Certainly a fact issue. So I believe that, uh, you know, basically, um, um, I think plaintiffs should have his day in court. We have a video. He has injuries on medical records, and I think it's debate. That's a debate. I think we should bring that debate to a jury and let the, um, appellant have his day in court. Thank you. All right, sir. Thank you very much. And the court will with that stand in recess.